# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 13, 2025

Lyle W. Cayce
Clerk

No. 24-20142

---

KENNETH D. ANDERSON; KRISTEN SANDOVAL, *Individually and Next Friend and Trustee of* N.B.A. *and* N.K.A.; ESTATE OF KENNETH ANDERSON, JR.; N.B.A.; N.K.A.,

*Plaintiffs—Appellees*,

EVELYN FAY AYERS-WOODS; KENNETH ANDERSON, SR.,

*Intervenor Plaintiffs—Appellees*,

*versus*

CRYSTAL ESTRADA, *Deputy*; MOHANAD ALOBAIDI, *Deputy*; VICTOR PAGE, *Deputy*; MERCY GARCIA, *Deputy*,

*Defendants—Appellants.*

---

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:21-CV-3730

---

Before KING, JONES, and OLDHAM, *Circuit Judges*.

EDITH H. JONES, *Circuit Judge*:

Deputy Mohanad Alobaidi drive-stunned Kenneth Anderson, Jr., who struggled in a drug-induced tantrum as Alobaidi and the other officer-defendants tried to secure him in Alobaidi's vehicle. Anderson died later.

1

No. 24-20142

Anderson's estate and Kristen Sandoval, individually and on behalf of two of Anderson's children, sued Alobaidi and the other officers at the scene; Anderson's parents intervened as plaintiffs. The district court granted the officers' motions to dismiss on some grounds but refused to dismiss an excessive force claim against Alobaidi and bystander liability claims against the other officers. We disagree that Alobaidi's force was objectively unreasonable, especially because of Anderson's active resistance. REVERSED.

## BACKGROUND

In the early morning of October 10, 2021, Kenneth Anderson, Jr., crashed a sedan in Harris County, Texas. Deputy Crystal Estrada was the first officer to arrive at the scene around 3:25 A.M. Her body camera shows Anderson's car against the curb near an intersection and angled toward oncoming traffic. Anderson was the only person inside the vehicle, where he was bleeding and initially unresponsive. He became responsive five minutes later, complied with orders to step out of the vehicle, and was handcuffed without incident. On-scene emergency medical technicians evaluated him. Deputies Mercy Garcia, Victor Page, and Mohanad Alobaidi soon arrived at the scene. At 4:23 A.M., Alobaidi stated that they could take Anderson in for driving under the influence, and the officers directed Anderson to Estrada's cruiser. They had some minor difficulty getting Anderson into the cruiser because he would not pull his own legs inside.

Traveling in separate vehicles, the four officers arrived with Anderson at a nearby gas station around 4:30 A.M.[1] They left Anderson in Estrada's

---

[1] Why the officers moved Anderson to the gas station, rather than directly into custody, is unclear. That said, Defendants' counsel during oral argument suggested—citing dialogue between the officers captured by the body camera—that this might have allowed first responders to clear the roadway. Oral Arg. 6:00–7:05. He also cited other

No. 24-20142

cruiser but noticed the vehicle shaking a few minutes later as Anderson thrashed inside.  At 4:40 A.M., Alobaidi asked Anderson—still in the backseat—if he needed water.  Anderson apparently replied affirmatively as Alobaidi brought his cup, opened the back door of the cruiser, and attempted to offer the cup to Anderson.  Rather than drink, Anderson scooted toward the open door.  At first, Alobaidi told Anderson to stay inside, but then allowed him to stand beside the cruiser.  Alobaidi directed Anderson toward his more capacious SUV.  As they walked, Anderson was asked about potential drug or alcohol use and admitted he had consumed "sherm," a street name for dried, PCP-dipped cigarettes.[2]  For no apparent reason, Anderson then asked if Alobaidi would tase him, to which Alobaidi replied that he would not.

Upon reaching the open, rear passenger-side door of Alobaidi's SUV around 4:43 A.M., Alobaidi asked Anderson to sit.  After being asked to sit nearly ten times, Anderson asked for water.  Alobaidi commented that Anderson did not drink any water when Alobaidi last offered some.  Nevertheless, Alobaidi negotiated with Anderson, offering to bring water again if Anderson sat down in the SUV.  Meanwhile, Garcia brought the water.  Anderson initially hesitated but leaned forward to drink after Alobaidi removed the lid.  When the cup was empty, Anderson remarked that he was "good now."

Alobaidi again asked Anderson to sit.  Anderson turned as if to do so but then turned back around to face the officers and asked for more water.

---

parts of the officers' dialogue to suggest that they might have transferred Anderson there to perform field sobriety or toxicology tests. Oral Arg. 7:05–55.

[2] "'PCP' is the recognized abbreviation for phencyclidine hydrochloride, a controlled substance which causes hallucinations and serious psychological disturbances." *Guilbeau v. W.W. Henry Co.*, 85 F.3d 1149, 1164 n.41 (5th Cir. 1996).

No. 24-20142

After about 20 seconds of back-and-forth, Garcia stepped in and offered to get more water if Anderson would sit in the SUV. This time, Anderson sat on the bottom of the doorframe, not on the seat, but soon moved to the seat after more coaxing. For about 30 seconds, Garcia tried to negotiate by encouraging Anderson to pull his feet inside the SUV while giving him more water. Anderson put his left foot into the SUV, and Garcia let him finish the water. But Anderson removed his foot from the SUV and asked for more. Garcia replied that he could only have more water if he pulled his feet inside. Anderson grew noticeably more insistent and began asking for milk instead. Garcia announced that the officers would pull Anderson into the car from the other side. Page approached and put his hands on Anderson's shoulders. Anderson attempted to stand up, but Page held him down and admonished him to stay seated.

Page tried to push Anderson into the SUV, but Anderson prevented this by stiffening his legs and hooking his feet under the door. Page pried his feet from under the door, and Anderson kicked his legs in an apparent attempt to re-hook them. Together, Alobaidi and Page wrangled Anderson onto his back in the backseat while Garcia and Estrada opened the opposite door to pull Anderson in from the other side. Still, Page and Alobaidi could not fully close the passenger-side door. Alobaidi stayed there to maintain their progress while Page ran to the driver-side door to help Garcia and Estrada. While Anderson thrashed, Page pulled him far enough for Alobaidi to close the passenger-side door. Alobaidi circled around to the driver-side door. Anderson's head stuck out and prevented the officers from closing that door.

At this point, seven minutes after he first ordered Anderson into the SUV, Alobaidi threatened to tase Anderson verbally and by cycling his taser. Cycling his taser made electricity audibly crackle from it. In response, Anderson began asking to be tased. Alobaidi pulled Anderson out of the

No. 24-20142

SUV and held him face-down on the ground as Garcia asked the other deputies whether they should try leg restraints. Alobaidi again cycled his taser and asked Anderson whether he would comply, and Anderson said he would. Page and Alobaidi helped Anderson to his feet. But Anderson threw his weight away from the open SUV door, prompting the officers to propel him head-first into the backseat. As Anderson's legs still remained outside the car, Alobaidi drive-stunned[3] Anderson several times.[4] Nearly ten minutes after the altercation had begun, Page and Alobaidi were finally able to close the door with Anderson inside the SUV.

As they stepped away from the SUV, Page and Alobaidi remarked that Anderson grabbed at their fingers during the struggle. A moment later, Alobaidi returned to the SUV and noticed Anderson in an unsafe position inside. Page went to the passenger-side door, opened it, and after two more minutes of struggling with Anderson, successfully repositioned him and closed the door. Alobaidi stated that the officers were lucky that Anderson did not resist when he was still "in the street," presumably referring to the scene of the accident. Alobaidi also remarked: "He's coming out of it, the PCP, so he's not feeling anything."

Emergency medical personnel arrived at the gas station around 5:08 A.M. Anderson was unresponsive, but the EMTs did not transport Anderson, allegedly because Alobaidi warned that he was dangerous.

---

[3] "The drive stun technique involves placing the end of the Taser directly on the person, without the cartridge containing the metal probes . . . . Each application of the drive stun technique delivers a jolt of electricity for about five seconds." *Carroll v. Ellington*, 800 F.3d 154, 164 (5th Cir. 2015). "A taser in drive-stun mode inflicts a painful electric shock on contact, but does not cause the same seizing effect" as "[w]hen taser prongs are deployed." *Cloud v. Stone*, 993 F.3d 379, 382 n.2 (5th Cir. 2021).

[4] It is unclear how many times Alobaidi drive-stunned Anderson, but the district court counted at least four.

No. 24-20142

Around the same time, Sergeant Joseph Douglass arrived and reminded the officers about a recent warning about the dangers of drive-stunning. Alobaidi and Garcia drove Anderson to the Harris County Joint Processing Center, where they arrived around 5:45 A.M. As Anderson remained unresponsive, emergency medical services were called again and unsuccessfully attempted to resuscitate him. Anderson was transported to a hospital and pronounced dead.[5]

Anderson's estate and Kristen Sandoval, individually and as next friend and trustee of Anderson's two children, sued the officers and Harris County about a month later. Anderson's parents, Kenneth Anderson, Sr., and Evelyn Fay Ayers-Woods, intervened on January 5, 2022. They asserted numerous claims against both the officers and Harris County. The district

---

[5] An autopsy report allegedly concludes that the drive-stunning caused Anderson's death. The degree to which that report concluded that the drive-stunning was a cause or the primary cause of death arose during oral argument. Oral Arg. 10:42–11:12. The autopsy report, however, was not appended to the pleadings. *See* Oral Arg. 10:25–42. But the issue does not impact this appeal because, as Plaintiffs' counsel made clear in oral argument, the Plaintiffs never brought a deadly force claim, but rather only an excessive force claim. Oral Arg. 38:18–35. We are unaware of any case in which drive-stunning with a taser has been deemed equivalent to "deadly force." Moreover, that a person dies following officers' use of force does not render the force inherently deadly.

Even if deadly force was sufficiently alluded to in the complaint as the dissent suggests, *see post* at 2 n.1 (KING, J., dissenting), and even if there were legal support for asserting that drive-stunning amounts to the use of deadly force, the Plaintiffs forfeited any such claim by failing to brief it to this court or to the district court despite its invoking a separate analysis. *See Timpa v. Dillard*, 20 F.4th 1020, 1032 (5th Cir. 2021) (To state a claim for deadly force, a plaintiff must also show that "the use of force carried a substantial risk of causing death or serious bodily harm."); *see also Carr v. City of Spring Valley Village*, No. 19-20373, 2022 WL 1553539, at *4 n.3 (5th Cir. May 17, 2022) ("Although Plaintiffs' opening brief occasionally uses the phrase 'deadly force,' it does not engage the standard of whether any officers' conduct creates a substantial risk of death or serious bodily injury. Thus, because we cannot conclude that any of the officers' conduct was presumptively unreasonable, this argument is forfeited.").

No. 24-20142

court dismissed all but the excessive force claim against Alobaidi and the corresponding bystander liability claims against Estrada, Garcia, and Page. The Plaintiffs do not appeal the claims dismissed, but the Defendants filed an interlocutory appeal to challenge the district court's denial of qualified immunity on the excessive force and bystander liability claims. This court has jurisdiction because "a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S. Ct. 2806, 2817 (1985).

## STANDARD OF REVIEW

This court reviews *de novo* the district court's denial of a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss for failure to state a claim. *See Harmon v. City of Arlington*, 16 F.4th 1159, 1162 (5th Cir. 2021). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570, 127 S. Ct. 1955, 1974 (2007)). "But this court does not presume true a number of categories of statements, including legal conclusions; mere labels; threadbare recitals of the elements of a cause of action; conclusory statements; and naked assertions devoid of further factual enhancement." *Armstrong v. Ashley*, 60 F.4th 262, 269 (5th Cir. 2023) (quotation marks and citations omitted).

"Moreover, where video recordings are included in the pleadings, as is the case here, the video depictions of events, viewed in the light most favorable to the plaintiff, should be adopted over the factual allegations in the complaint if the video 'blatantly contradict[s]' those allegations." *Harmon*, 16 F.4th at 1163 (quoting *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776 (2007)) (alteration in original). The Plaintiffs insist that we turn a blind

eye to the video evidence. But where a party "referenced the video in their complaint and brief" and "included several screenshots from the video in their complaint," "caselaw supports our consideration of the video." *Winder v. Gallardo*, 118 F.4th 638, 643–44 (5th Cir. 2024) (per curiam). Because the Plaintiffs and Intervenors both referenced the video in their complaints and included multiple screenshots from it in their brief to this court, we consider the video.

## DISCUSSION

Alobaidi "is entitled to qualified immunity at the motion-to-dismiss stage unless the plaintiffs have alleged facts sufficient to plausibly show that (1) the defendant's conduct violated a constitutional right and (2) the constitutional right was clearly established at the time of the alleged misconduct." *Harmon*, 16 F.4th at 1163 (citing *Pearson v. Callahan*, 555 U.S. 223, 232, 129 S. Ct. 808, 816 (2009)). We are "permitted to exercise [our] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236, 129 S. Ct. at 818, *overruling in part Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151 (2001). Here, we need only address the first prong, and we hold that Alobaidi did not violate Anderson's constitutional rights.

### I.

"The Fourth Amendment creates a 'right to be free from excessive force during a seizure." *Trammell v. Fruge*, 868 F.3d 332, 340 (5th Cir. 2017) (quoting *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012)). "To establish a claim of excessive force under the Fourth Amendment, plaintiffs must demonstrate: '(1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.'" *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir.

No. 24-20142

2009) (per curiam) (quoting *Tarver v. City of Edna*, 410 F.3d 745, 751 (5th Cir. 2005)).

Determining whether the force used was clearly excessive and clearly unreasonable "requires careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 1872 (1989). "A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley v. Hendrickson*, 576 U.S. 389, 397, 135 S. Ct. 2466, 2473 (2015).

"The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S. Ct. 1861, 1884 (1979). But we must begin with the three *Graham* factors. Each factor suggests that Alobaidi used objectively reasonable force. We then examine them together and in light of Alobaidi's taking "measured and ascending actions that corresponded to [Anderson's] escalating verbal and physical resistance." *Poole*, 691 F.3d at 629 (quotation marks and citation omitted). All told, we conclude that Alobaidi's force was objectively reasonable and did not violate the Fourth Amendment.

A.

Applying the first *Graham* factor, the "crime at issue" was serious. *See id.* The Plaintiffs concede that the officers stated they were bringing Anderson into custody for driving under the influence ("DUI"). Before the drive-stunning took place, Anderson admitted that he was under the influence of sherm, and Alobaidi's remarks about PCP after the incident reveal that he knew the effects of sherm. It follows that, from the reasonable

officer's perspective, DUI was the underlying offense.[6]  In this circuit, DUI is a serious crime.  *See Griggs v. Brewer*, 841 F.3d 308, 316 (5th Cir. 2016); *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016); *Brothers v. Zoss*, 837 F.3d 513, 519 (5th Cir 2016); *Scott v. City of Mandeville*, 69 F.4th 249, 256 (5th Cir. 2023).

The Plaintiffs try to distinguish the DUI precedents by arguing that DUI was only deemed serious in those cases because the arrestees resisted. This argument conflates the *Graham* factors.  If a crime's seriousness turns on the degree of an arrestee's resistance, then seriousness ceases to be an independent factor.  Moreover, that arrestees in other DUI cases resisted custody does not distinguish this case because, as will be discussed below, Anderson was actively resisting.  Plaintiffs point to *Trammell v. Fruge*, which noted that intoxication-related misdemeanors are not generally serious.  868 F.3d at 340.  But *Trammell* involved a public intoxication arrest, not a DUI, and does not purport to hold that *all* intoxication-related misdemeanors are not serious.  *Trammell* does not derogate from this court's repeated, unequivocal, and binding holdings that DUI is a serious crime under *Graham*.

Finally, Anderson's crime is emblematic of the seriousness of a DUI arrest.  While under the influence of PCP, he was driving late at night, crashed into a curb, and his car ended up facing opposite the flow of traffic. There was a high chance that in the darkness he could have collided head-on

---

[6] The district court mistakenly relied on the Plaintiffs' allegation that Anderson was arrested because of an open warrant for nonappearance in court for failure to have a driver's license and found no serious underlying crime.  The district court also noted the Intervenors' allegation that the officers thought Anderson might be a murder suspect, but that the officers knew any such suspicion was unsubstantiated before they used force.  The district court erred by failing to credit the Intervenors' allegation, substantiated by video, that Alobaidi remarked that the officers could take Anderson in for DUI.

with another vehicle or that oncoming traffic could have hit Anderson's car in its wrecked position. Anderson's conduct posed a serious risk of injury to himself and others. Such risks are comprehended by this court's precedents holding DUI offenses to be inherently serious under *Graham*.

## B.

Pertinent to the second *Graham* factor, Anderson posed an immediate risk to the officers' safety. Anderson was, as this court put it in *Griggs*, "capable of and evinced erratic behavior." 841 F.3d at 316. That is enough to establish a threat because any of the officers could be injured by Anderson's kicking, thrashing, and throwing himself around. He was a very large man compared to the male officers and especially the two female officers involved in subduing him. *Tucker v. City of Shreveport*, 998 F.3d 165, 180 (5th Cir. 2021) (an arrestee's relative size informs how a reasonable officer would understand and respond to an escalating situation). Nevertheless, the Plaintiffs counter that Anderson was not a threat for the first hour of his detention; Deputy Alobaidi created any threat by "commanding Mr. Anderson to exit Estrada's vehicle"; and any threat Anderson did pose was "minimal" because he was handcuffed.

These arguments fail. First, while "the question is 'whether the totality of the circumstances justifie[s] a particular sort of . . . seizure,'" Anderson's initial compliance at the scene of his car accident cannot make his later actions at the gas station any less threatening to the officers' safety. *See Graham*, 490 U.S. at 396, 109 S. Ct. at 1872 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8–9, 105 S. Ct. 1694, 1699–1700 (1985)) (alteration in original).

Second, the notion that Alobaidi precipitated a confrontation by directing Anderson to exit Estrada's cruiser is clearly contradicted by the video. Instead, Alobaidi opened the car door to offer Anderson water, and Anderson moved to step out of the cruiser while Alobaidi instructed him not

to.  Alobaidi relented and allowed Anderson to stand without attempting to physically detain Anderson in the car.  We reject any argument that Alobaidi's attempt to avoid escalation, by allowing Anderson to stand outside the cruiser, somehow incited Anderson's increasingly erratic behavior over the following minutes or undermined Alobaidi's reasonable perception of a growing physical threat.

Third, that Anderson was handcuffed has no necessary bearing on whether he was a threat.  *See Pratt v. Harris Cnty.*, 822 F.3d 174, 178–82 (5th Cir. 2016).  Unpredictable aggressive behavior is often associated with PCP inebriation, as Alobaidi recognized.  Indeed, Intervenors' counsel essentially agreed during oral argument that Alobaidi should not have allowed Anderson out of Estrada's cruiser because he was exhibiting "aggressive behavior." Oral Arg. 28:55–29:15.  That belies the notion that no reasonable officer could have perceived Anderson, handcuffs notwithstanding, as a threat when he kicked, thrashed and threw his sizeable body around to avoid confinement in the SUV.

## C.

Under this court's interpretation of the third *Graham* factor, we conclude that Anderson was actively resisting the officers.  The Plaintiffs vigorously disagree.  But the Plaintiffs' characterization of the facts is contradicted by the video, which shows Anderson kicking, thrashing, and using his weight against the officers to prevent his being loaded into the SUV.  The line between an arrestee's active and passive resistance and the purpose of resistance are significant to the parties and requires review of this court's relevant cases.

To begin, the third *Graham* factor concerns the degree to which an arrestee resists the officer's mission or objective.  While the second *Graham* factor examines the threat the arrestee poses to law enforcement, the third

No. 24-20142

considers the degree of the arrestee's resistance. Contrary to the position espoused by the Plaintiffs and district court, whether resistance is active or passive does not turn solely on whether an arrestee poses a serious physical threat. The separate factors should not be conflated. Instead, excessive force cases "require[] careful attention to the facts and circumstances of each particular case," and courts accordingly must not weigh the factors in a "mechanical" way. *Graham*, 490 U.S. at 396, 109 S. Ct. at 1872 (first quote); *Bell*, 441 U.S. at 559, 99 S. Ct. at 1884 (second quote). That does not permit blending the *Graham* factors into an analytical hodge-podge.

This court's case law has helpfully elucidated distinctions between active and passive resistance, and the potential overlap of that factor with the question of a physical threat to the officers or others. In *Cloud v. Stone*, for instance, we contrasted cases in which arrestees "aggressively evaded [officers'] attempts to apprehend [them]" with cases where arrestees merely pulled their arms away from arresting officers and/or made snide comments at the officers. 993 F.3d 379, 384–85 (5th Cir. 2021) (quoting *Pratt*, 822 F.3d at 182).[7] And in finding active resistance in *Betts v. Brennan*, after reiterating the same line described in *Cloud*, we explained:

> Betts did not just mouth[e] off at Brennan, ignore one of his orders, or move away from his grasp. Rather, as the video shows, Betts adopted a confrontational stance at the outset and things got worse from there. Betts repeatedly contested why

---

[7] In *Cloud*, as the officer handcuffed the arrestee's hands behind his back, the arrestee spun around to face the officer. 993 F.3d at 382. The officer tased the arrestee. *Id.* When the arrestee pulled the taser prongs from his chest, the officer drive-stunned him. *Id.* The struggle continued to escalate, and the officer eventually shot and killed the arrestee. *Id.* While the deadly-force claim that the court rejected in *Cloud* is not fully apposite to the present discussion, the court instructively found the arrestee's actions preceding the tasing and drive-stunning were active resistance, rendering uses of force reasonable. *See id.* at 384–87.

he was stopped, ignored dozens of Brennan's commands, disputed Brennan's authority, accused him of lying, batted away his hand, warned Brennan to call other officers, and dared Brennan to tase him. Most importantly, Betts repeatedly disputed Brennan's power to order him to stand behind the truck.

22 F.4th 577, 584 (5th Cir. 2022). The third *Graham* factor, in sum, concerns the degree of resistance to the officer's *objective*.

Here, it happens to concern whether the arrestee was actively or passively resisting being put inside Alobaidi's SUV. As laid out above, *Cloud* and *Betts* discuss this line. An arrestee who is "restrained and subdued" is not actively resisting. *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008). But those characteristics of passive resistance are conjunctive: that a suspect is handcuffed does not end the inquiry. *See Carroll v. Ellington*, 800 F.3d 154, 177 (5th Cir. 2015) ("once a suspect has been handcuffed and subdued, and is no longer resisting, an officer's use of force is excessive"); *Bailey v. Ramos*, 125 F.4th 667, 684 (5th Cir. 2025) ("use of force against a handcuffed suspect is not excessive if the suspect is resisting by ignoring lawful commands").

When an arrestee "mouth[es] off" or pulls a hand away from an officer, that does not quite cross the line into active resistance under most circumstances. *Betts*, 22 F.4th at 584; *see also Trammel*, 868 F.3d at 341–42 (citing *Goodson v. City of Corpus Christi*, 202 F.3d 730, 734, 740 (5th Cir. 2000)). Similarly, an arrestee's merely "tens[ing] up" when an officer grabs him is passive resistance. *Samples v. Vadzemnieks*, 900 F.3d 655, 662 (5th Cir. 2018); *but see Angulo v. Brown*, 978 F.3d 942, 951 (5th Cir. 2020) (arrestee who tried to remain seated in a vehicle, despite an officer's pulling, "with such force that the vehicle rocks from one side and the headlights flicker"). But even so, this court's cases "do[] not establish that when mere passive resistance is at issue, officers are precluded from using any force, but instead

that the amount of reasonable force varies." *Robles v. Ciarletta*, 797 F. App'x 821, 828 (5th Cir. Dec. 19, 2019); *see Escobar v. Montee*, 895 F.3d 387, 394–95 (5th Cir. 2018) (citing *Cooper*, 844 F.3d at 524); *cf. Grisham v. Valenciano*, 93 F.4th 903, 912 (5th Cir. 2024) ("Grisham did not put his hands behind his back when ordered but instead kept them within reach of his handgun. Given these circumstances, it was not unreasonable for Chief Valenciano to believe—at the time he deployed the taser—that Grisham was both a safety threat and resisting arrest.").

As soon as resistance escalates into any physical action beyond nonthreateningly pulling his hand back, the arrestee is actively resisting. Repeated attempts to withdraw from an officer or declining to follow an officer's orders constitute active resistance. *Betts*, 22 F.4th at 584. "Pull[ing], twist[ing], turn[ing], or walk[ing]" toward or away from an officer amount to active resistance when those actions frustrate the officer's objective or disobey an officer's order. *Craig v. Martin*, 49 F.4th 404, 416 (5th Cir. 2022); *see Benfer v. City of Baytown*, 120 F.4th 1272, 1278, 1282–83 (5th Cir. 2024); *cf. Timpa v. Dillard*, 20 F.4th 1020, 1031 (5th Cir. 2021) (if arrestee's "'squirm[ing]' and 'mov[ing]' his head from left to right" were not "in order to breathe," it would be active resistance).

Accordingly, an arrestee actively resists by ignoring an officer's order to *stop* doing something or to refrain from doing something. *Benfer*, 120 F.4th at 1278, 1282–83; *see also Romero v. City of Grapevine*, 888 F.3d 170, 174–75 (5th Cir. 2018); *but see Deville*, 567 F.3d at 162–63, 167 (passive resistance when grandmother who was pulled over with her 2-year-old granddaughter declined to follow command to exit vehicle until her husband arrived). An arrestee who backs away while slapping at an officer's arms, rather than just pulling back her hand, is also actively resisting. *Slight v. City of Conroe*, 87 F.4th 290, 297, 299 (5th Cir. 2023); *see also Hogan v. Cunningham*, 722 F.3d 725, 734 (5th Cir. 2013) (arrestee shutting the door to the doorway of his

home in which he stood was actively resisting).  Even an arrestee who only "backs away from the arresting officers is actively resisting arrest—albeit mildly." *Solis v. Serret*, 31 F.4th 975, 982–83 (5th Cir. 2022) (quoting *Buehler v. Dear*, 27 F.4th 969, 984 (5th Cir. 2022)).

Under these precepts, the video shows that Anderson actively resisted the officers in this case.  Anderson kicked at them when attempting to hook his feet under the SUV door, thrashed as the officers struggled to secure him inside the SUV, used his weight to make the officers' task more difficult, and failed to comply with countless orders by the officers to stop resisting and to sit in the vehicle with his legs inside.  Anderson's actions, which frustrated for a lengthy period the officers' attempts to secure him inside the SUV, constituted active resistance.

## D.

Because the *Graham* factors weigh in favor of some use of force by the officers, the remaining question is whether Alobaidi's drive-stunning was a reasonable response.  *See Deville*, 567 F.3d at 167 ("officers must assess not only the need for force, but also 'the relationship between the need and the amount of force used.") (quoting *Gomez v. Chandler*, 163 F.3d 921, 923 (5th Cir. 1999); *Salazar v. Molina*, 37 F.4th 278, 281 (5th Cir. 2022) ("the permissible degree of force depends on the *Graham* factors.") (quoting *Cooper v. Brown*, 844 F.3d 517, 524–25 (5th Cir. 2016)).  Our cases emphasize that "measured and ascending actions that correspond to [the arrestee's] escalating verbal and physical resistance" are reasonable.  *Cloud*, 993 F.3d at 384 (quoting *Joseph ex rel. Estate of Joseph v. Bartlett*, 981 F.3d 319, 332–33 (5th Cir. 2020) (quoting *Poole v. City of Shreveport*, 691 F.3d 624, 629 (5th Cir. 2012))) (alterations in original); *see Betts*, 22 F.4th at 583.  Weighing the *Graham* factors here, the seriousness of Anderson's DUI crime, the threat Anderson posed to the officers, and his active resistance, against the force

used, we conclude that Alobaidi's conduct was reasonable and did not violate Anderson's Fourth Amendment rights.

*Pratt v. Harris County* is instructive and virtually on all fours with this case:

> Pratt ignored multiple requests and warnings from both Lopez and Medina. Indeed, Pratt aggressively evaded Lopez and Medina's attempts to apprehend him. Only after he continuously failed to comply, did either deputy deploy tasers; Medina used his taser only after Lopez's efforts to subdue Pratt were ineffective. The evidence showed that Medina cycled his taser only when Pratt continued to resist handcuffing. Once Pratt complied, and Goldstein was able to handcuff him, Medina stopped using his taser. But, when Pratt kicked an officer after being taken to the ground, Medina used his taser again; and, once again, officers were able to control him. It is also important that neither officer used their taser as the first method to gain Pratt's compliance. The record shows that both officers responded with measured and ascending actions that corresponded to [Pratt's] escalating verbal and physical resistance.

822 F.3d at 182 (quotation marks and citations omitted) (alteration in original).

Here, Alobaidi's measured and ascending actions were proportional to the escalating situation. As the Plaintiffs concede, no force was used for approximately the first hour after Anderson was detained at the scene of the accident. Neither was any force used in moving Anderson from Estrada's cruiser to approach Anderson's SUV. When Anderson asked Alobaidi whether he would be tased, Alobaidi naturally responded in the negative. But then, as Anderson ignored dozens of orders by the officers to enter the SUV, the officers tried and tried again to negotiate with him. For minutes, they

No. 24-20142

tried to reason with him, offering him water in exchange for his compliance, and even providing him with water when he failed to comply.

Only when Anderson suddenly tried to stand out of the SUV did the officers resort to pushing and pulling to get him into the vehicle. They did not strike, choke, tackle, drive-stun, tase, or apply any heightened force. Rather, they continued to push and pull for nearly ten minutes as Anderson kicked at them, thrashed, and otherwise actively resisted. After minutes went by and the officers began to realize the futility of their approach, Alobaidi drew his taser. But instead of using it right away, he attempted to restart negotiations with Anderson. He cycled it, asked Anderson if he would comply, and said that he would be tased if he did not comply. Anderson still failed to comply, and even began asking to be tased.

As a last-ditch ameliorative effort,[8] Alobaidi pulled Anderson from the vehicle and onto the ground, once again cycled the taser and asked if Anderson would comply. When Anderson replied that he would, Alobaidi helped him to his feet. That is when Anderson threw his weight toward the officers, rather than into the vehicle. Once the officers managed to get Anderson inside, Alobaidi began drive-stunning Anderson as it became clear that the officers' other attempts at securing compliance were futile. As soon as Anderson was subdued, and the officers were able to place him fully inside the SUV, Alobaidi stopped drive-stunning him. Moments later, when they realized that Anderson was precariously positioned, Alobaidi did not resume drive-stunning, even though Anderson was still actively resisting, as the officers adjusted his body.

---

[8] Although Garcia asked the others about potentially using leg restraints around this time, the officers' failure to attempt that after fighting a kicking arrestee for nearly ten minutes was not objectively unreasonable.

No. 24-20142

Alobaidi's use of force, in drive-stunning Anderson after much time had elapsed and both negotiations and lesser force had proved fruitless, was reasonable under the circumstances and did not transgress constitutional limits.[9] Because the allegations of the complaint, graphically depicted in the video, fail to show a constitutional violation by Alobaidi, none of the other defendants can be liable under a bystander liability theory. The district court erred in denying Appellants' motion to dismiss these claims.

The judgment of the district court is REVERSED.

---

[9] Plaintiffs mention various questions of local police department policy, including a policy on drive-stunning and a policy for "crisis intervention response that should be used for drugs." Oral Arg. 26:16–26; 41:46–55. Those issues do not bear on whether officers' actions violated the constitution. Regardless, the Harris County policy on "Conducted Electrical Devices" (CEDs) does not necessarily suggest that Alobaidi's use of the drive-stun technique was a violation. Among other things, the policy directs officers "to always attempt to de-escalate" first; authorizes officers to use CEDs "to control dangerous or violent suspects when deadly force does not appear to be justified or necessary"; and reminds officers that successive uses of CEDs can be dangerous and that officers must therefore assure that each use is "reasonable and individually justified."

No. 24-20142

King, *Circuit Judge*, dissenting:

The district court determined that the plaintiffs adequately alleged that one officer's fatal use of a taser, and other officers' failure to intervene, was a constitutional violation of clearly established law. I agree.

To conclude that Alobaidi's use of force was reasonable, the majority relies on the video to find Anderson posed a threat to officers and actively resisted arrest. But Plaintiffs and Intervenors alleged that when the taser was deployed, Anderson was neither posing a threat nor actively resisting: He was disoriented, handcuffed, unarmed, and contained in the back of a police car. And the video, viewed in the light most favorable to the plaintiffs, supports, rather than blatantly contradicts, these allegations. *See Darden v. City of Fort Worth*, 880 F.3d 722, 730 (5th Cir. 2018) (recognizing the blatant contradiction standard is a "demanding one: a court should not discount the nonmoving party's story unless the video evidence provides so much clarity that a reasonable jury could not believe his account").

Whether and to what extent Anderson posed an immediate safety threat to officers, or actively resisted arrest, present factual questions that cannot be resolved in favor of the officers on a motion to dismiss. *See Darden*, 880 F.3d at 729–30 (denying qualified immunity on excessive force claim in part because "a jury could conclude" that "no reasonable officer would have perceived [arrestee] as posing an immediate threat to the officers' safety" or as resisting arrest). Our cases do not establish the sweeping test for active resistance the majority strains to articulate, but rather recognize that "the line between active and passive resistance is sometimes hazy and must be judged in light of the 'necessarily fact-intensive' nature of the inquiry." *Betts v. Brennan*, 22 F.4th 577, 583 (5th Cir. 2022) (quoting *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009)).

No. 24-20142

In any case, we must consider "not only the need for force, but also the relationship between the need and the amount of force used." *Cloud v. Stone*, 993 F.3d 379, 384 (5th Cir. 2021) (quoting *Joseph ex rel. Estate of Joseph v. Bartlett*, 981 F.3d 319, 332 (5th Cir. 2020)). Plaintiffs and Intervenors further alleged, and the video supports, that Anderson "was drive-stunned repeatedly" and "for an extended period of time . . . at least twenty-four (24) seconds in a span of just two minutes." Anderson died as a result.[1] Moreover, the officers had been warned about the dangers of drive-stunning and instructed against using the technique in a recent memorandum. *See Darden*, 880 F.3d at 732 n.8 (explaining the existence of police department policies and "corresponding notice to officers" is "relevant in analyzing the reasonableness of a particular use of force").

Even assuming the *Graham* factors justified some use of force, a "jury could reasonably find that the *degree* of force the officer[] used was not justifiable under the circumstances." *Crane v. City of Arlington*, 50 F.4th 453, 465 (5th Cir. 2022). Relatedly, a jury could find, as the district court noted, that the *prolonged* use of the taser in drive-stun mode was unreasonable. *See Timpa v. Dillard*, 20 F.4th 1020, 1030 (5th Cir. 2021) ("A jury could find that no objectively reasonable officer would believe that [arrestee]—restrained, surrounded, and subdued—continued to pose an immediate threat of harm justifying the prolonged use of force."); *Bartlett*, 981 F.3d at 335 (explaining

---

[1] The majority concludes the allegation that the drive-stunning caused Anderson's death is not relevant to this appeal, because an exchange at oral argument "made clear" that Plaintiffs did not bring a deadly force claim. But the complaints repeatedly allege the use of "deadly force," and Plaintiffs and Intervenors have maintained that the force caused Anderson's death. Regardless of whether they have proceeded on a theory of deadly force, the injury inflicted—death—is relevant to determining whether the force was excessive. *See Deville*, 567 F.3d at 168 ("Thus, 'the extent of [the] injury inflicted' may be considered in determining whether the officers used excessive force." (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986))).

No. 24-20142

that "even if [arrestee] failed to comply and struggled against the officers at certain points throughout the encounter, that resistance did not justify force indefinitely" because "[f]orce must be reduced once a suspect has been subdued" or "lacks any means of evading custody").

Furthermore, when the facts are properly viewed in favor of Plaintiffs and Intervenors, Alobaidi's use of force violated clearly established law. *See, e.g.*, *Boyd v. McNamara*, 74 F.4th 662, 668 (5th Cir. 2023), *cert. denied sub nom. Johnson v. Boyd*, 144 S. Ct. 562 (2024) (holding officer was on notice that "he could not constitutionally fire a taser at a non-threatening, compliant subject"); *Timpa*, 20 F.4th at 1034 (holding that "the law has long been clearly established that an officer's continued use of force on a restrained and subdued subject is objectively unreasonable").

Having concluded that Plaintiffs and Intervenors sufficiently alleged an excessive force claim against Alobaidi, I would also affirm the district court's decision to deny qualified immunity on the bystander liability claims against Officers Garcia, Page, and Estrada. I agree with the district court that Plaintiffs and Intervenors' allegations that the officers knew Alobaidi was using excessive force, had time to intervene, and failed to do so, are sufficient to state a constitutional violation. *See Bartlett*, 981 F.3d at 343–45. And "*Hale* is clearly established law that provides fair notice to officers of their duty to intervene, rather than to acquiesce, in the unconstitutional conduct of others." *Austin v. City of Pasadena*, 74 F.4th 312, 331 (5th Cir. 2023) (citing *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995)).

\*      \*      \*

In sum, "a jury could ultimately determine that [Anderson] was in fact resisting arrest or disobeying commands" or posing a threat to a degree that justified the prolonged and fatal use of a taser in drive-stun mode. *See Bartlett*,

No. 24-20142

981 F.3d at 342. But at this early stage, "a jury could also find facts demonstrating the opposite." *Id.* I respectfully dissent.